Call me Case 16-4171, Barbara Jackson v. Professional Radiology, Inc. at all. Oral order needs 15 minutes for the plaintiff, 15 minutes to be shared by defendants. Viewing 4-0. Okay, and I'm going to ask you to hold for just a moment. Let me see the clerk. Just a moment. I apologize for the slight delay. We won't count it against their time, though. No, we won't. This is a clock-tolling event. And now, we are ready to proceed with the first case. Thank you, Your Honor. Thank you. May it please the Court, Judge Donald, Judge Guy, Judge Seiler, Counsel, I'd like to reserve five minutes for rebuttal. On April the 7th of 2014, the appellant in this case, Barbara Jackson, was involved in a serious automobile accident and transported to a hospital in Westchester. When she arrived at the hospital, she received the services of the Appellee Professional Radiology, Inc., When she received those services, she received them as an insured of UnitedHealthcare. UnitedHealthcare contracted with PRI. PRI was an in-network preferred provider. And when PRI rendered those services, they rendered them to UnitedHealthcare's insured. Upon presenting evidence that she was insured, Barbara Jackson, at that time and from that moment, had no liability for the bill generated by Professional Radiology. They had no liability, she had no liability for that bill, under the law of the State of Ohio and specifically under Ohio Revised Code 1751. And so Ohio Revised Code 1751 contains actually three parts. 1751A, which prohibits the billing or collection for Ms. Jackson. 175160B, which states unequivocally that once she presented that evidence of insurance, that thereafter she had no liability for the bill. And 1751.13C2, which states that that protection survives, even in the event that the insurer becomes insolvent, and even in the event that the insurer does not pay. So her bill becomes a contract between her insurer and the collector of the debt, right? Whoever provided the service, like the hospital. Whoever provided the services, Your Honor, could collect it from her insurer or collect it from anyone else, but they could not collect it from Ms. Jackson. They could not contact her about it, you're saying? Exactly, Judge. There was no debt to be collected. The appellee in this case, professional radiology, attempts to evade those protections by arguing throughout the brief that these statutes were merely a balance billing statute. In other words, the argument of the appellee is that so long as professional radiology did not bill UnitedHealthcare, the health insurer, it was not prohibited from billing Ms. Jackson. If PRI billed UnitedHealthcare, then the appellee's argument is that they could not bill Ms. Jackson for the balance between their full bill and the bill paid by UnitedHealthcare. They argue that they had the right to elect which one they would go against, notwithstanding the language that you have referenced earlier. Yes, Your Honor. They certainly do. And I suppose I'll ask them that, but on which language from the contract is that reliance placed? And I realize that they're going to tell me, but you say that's not true, so what is the language that you look to that says I can't do that? I'm sorry, Your Honor. That is absolutely not true. And that's not true because the language which I have stated to the court is by force of law in Ohio included in the contract. So it is not only the law of Ohio, it is contractual language that is mandated to be in the contract. And when the law of Ohio under 175160B states that once she provides proof of insurance, she shall have no liability, there simply is no argument. The appellee makes an argument, and the argument that they make is that that was all turned around by the King v. ProMedica case, which is the seminal case from the Ohio Supreme Court in regard to 1751. And on page 30 of the appellee's brief, they state that the holding of the court in King was that the statute does not apply unless the health provider bills the health insurer. That would get you to where they want to go. Absolutely. And that would be fatal to our case. Absolutely. However, they state that the court so held at paragraph 12 of its opinion. A reading of paragraph 12 indicates that is not at all what the court held. What the court held was that the statute only applies when a health provider bills a health insuring corporation's insurer, namely Ms. Jackson. So the holding that's stating is incorrect. There's nothing in Ohio law that would give them the right to do what they did. There's nothing in Ohio law that would permit them to directly bill her. In this case, this case is unlike the King v. ProMedica case, where a third party was billed, namely Safeco Insurance, the MedPay insurer. It's unlike the Anita Hayberg v. Robinson Memorial case, where the bill was sent directly to Nationwide, the Tort Feasers Insurance Company, which for some mysterious reason paid a debt that she didn't know and that Nationwide didn't know. None of that occurred in this case. This is a case of direct billing. Every bill went directly to Ms. Jackson. Every bill contained a statement that she owed the debt, that her debt was in arrears. There's no mention of any third party. This is a direct billing case. This was what the statute was intended for. And when they did that, they did that in contravention of state and federal law. And this was all about $3.97. Well, Your Honor, initially, I know where the court is on that, the initial bill was $800 and some dollars. And then after they collected that from her, they came back at the end and said, you still owe $3.49. That was the triggering event. The triggering event was both the $800 and the $3.49. They weren't supposed to contact her on the $800 at all. No, sir. Your position. Our position is that under the FDCPA and under the OCSPA, there is no right to collect a debt that's legally not collectible. So they weren't to collect her on the $8.52 or the $3.49 or $3.97 or whatever it was. Neither one. So you also sued the CCC, the collection agency. Yes, ma'am. And tell me about that theory. Are they standing in the – they're the agent of the billing entity? Tell me about that. Yes, ma'am. They were hired by PRI to collect the debt from Mrs. Jackson when they were unsuccessful in doing so themselves. CCC is a debt collector. They claim to be nothing else. And the letters that they sent were debt collection letters. And the claim against CCC is that federal law first prohibits misrepresentation, the misrepresentation being that you owe the bill when under Ohio law they didn't. And so it's somewhat akin to a time-barred bill. It's somewhat akin to – You're attributing to CCC the same knowledge and the same position that you attribute to the original collector, because you're saying that they knew they weren't supposed to do this. CCC is not a health care provider. They're, as you said, a debt collection agency. And so you're saying they collected her – contacted her, rather, about a debt that she didn't owe. But if they're relying on information from the health care provider that says, we're owed 850 – let's say 860 or whatever. We're owed this. The person hadn't paid. Collect it. Why would any additional knowledge be attributed to them? Well, Your Honor, two things. Number one, we don't know what they knew and what they did not know, because we have an undeveloped record. We do not know what's in their file, and we do not know what the commission was. But it is at least probable that they had to inquire in regard to, where did this debt emanate from? And it could be, if we have a chance to develop the record, that CCC was provided the information that UnitedHealthcare existed and was told, collect it from Ms. Jackson, and if that doesn't work, we'll go to the health insurer. Don't know that that's what – but, you know, we're standing in the dark because the case was dismissed. Okay. And I know you're almost out of time, but I need to ask you one other question. There is a second case, basically, I suppose, originating out of almost the same nucleus of facts, or at least closely related facts. Do we have two cases because there were two affected entities here? I'm not familiar with the other case. I just know that it exists and that it's being argued, I believe, today, perhaps? Right now. Okay. There are two teams. Okay, very good. But can I address that? Yeah, please. Actually, I agree with Your Honor, and out of an abundance of caution we contacted the clerk because there were separate arguments that were scheduled in those cases, and we told the clerk that these were related cases and the court may decide not to have separate arguments on them because they do spring from the same operative, nucleus of operative fact, and they do involve the same statutes and the same cases. But not the same people. But not the same people. That's correct. Not the same law firm? Not the same, well. Does your firm represent the plaintiff in that case, too? I am on that case, yes, Your Honor. I'm out of Louisville, but yes, it's Mr. Frank who's here in Cincinnati, and he's on this case, and I'm on that case. Thank you. Thank you. Thank you, Your Honor. The appellees will divide their time ten minutes for my clients and five minutes for CCC. Thank you. Judge Donald, Judge Seiler, Judge Guy, good morning. May it please the court. On behalf of the Defendant Appellees Professional Radiology, Inc., and MD Business Solutions, we respectfully submit that the trial court properly granted the 12B6 motion for either of two separate reasons. One, the trial court properly recognized that the statute in question, ORC 1751.60, is limited only to balanced billing situations. Would you just give me your name for the record? Of course, Your Honor. My apologies. I'm Toby Schistler with Densmore & Scholl. Thank you. Thank you, Your Honor. Alternatively, under the court's de novo review, we would respectfully submit the trial court could affirm the granting of the motion to dismiss for any of the arguments set forth in our 12B6 motion. Notably, we didn't contest the applicability of 1751.60 in our motion to dismiss. We moved for separate reasons and argued that none of the causes of action set forth in the complaint meet the Equal Twombly Standard and state a plausible cause of action. Under what circumstance does this statute apply if it doesn't apply in your case? It would apply in situations where there's a contract between the provider and a health insurance company, which we acknowledge exists. Between United and your client? Correct. And? The hospital have one between? As far as we know. I don't believe there's any evidence in the record to indicate whether the hospital had a contract, but I believe the hospital had a contract. Most of these insurers won't even go into the hospital unless they have a contract with it. I mean, they won't let their clients go in. Correct. Correct. So to answer your question, Your Honor, it would exist when there was a contract in place and the provider sent a bill or attempted to collect from the health insurance corporation. The statute, probably the clearest guidance from the State of Ohio on this issue comes from the Ohio Department of Insurance Regulatory Guideline. It's in the context of the Supreme Court's King decision, which notes that the statute is of limited application. The guidance from the Ohio Department of Insurance states several things. One, there's no private cause of action under 17-5-1.60. And two, the statute only applies to situations where there is balanced billing. So if a provider makes— That would happen in almost every case, wouldn't it? Like Anthem will make a contract with health providers for 50% on the dollar. Correct, Your Honor. And I guess United does too. Correct. For business reasons, providers will choose to accept frequently discounted payment from the health insurance corporation because there's guaranteed payment. They know they have a solid revenue source, and they'll make the determination to seek payment from that health insurance corporation. But what the statute says is you've agreed to take a discounted amount. You can't then come back to the patient and say, the value of the services we provided were worth $1,000. Our contract with UHC says we only get $600. You owe us the extra $400. That's what the statute precludes. But if I'm looking at 1751.60A, the language says every provider of health care, every provider or health care facility that contracts with a health insurance corporation to provide services shall seek compensation for covered services solely from the health insuring corporation and not under any circumstances from the enrollees or the subscribers except for approved copayments and deductibles. Now, that seems pretty clear, and it seems to align with Mr. Ewing's argument. How do you get the case you just made to Judge Seiler from reading that language? The statute certainly says what it says, Your Honor. We don't dispute that. The trial court, looking at the totality of the Ohio authority on this issue, including the Haberg decision from the Ohio Court of Appeals, which explicitly says that a health care provider is not required to submit a claim to the health insuring corporation, even if they have a contract with that entity. They're not required to submit a claim to that entity. So if there's a contract by United for payment of 50% on it, your clients can just go straight to the patient and say, We want 100% of this bill, and we don't care what United says. We would respect to say that's a business decision for the provider to make. There's not a single Ohio case that we're aware of that has ever held this statute applies to anything other than a balanced billing situation. We're not aware of any court that's ever reached that conclusion. It's sure done that way all the time, isn't it? That providers go to the insurance company and they waive anything against the patient, right? Correct. There's no doubt that what clearly could not happen is my client submits a claim to UHC, gets paid, and then asks for the difference from Ms. Jackson. That would be a clear violation of 1751.60. That's the balanced billing situation that the Ohio Department of Insurance says the statute is designed to guard against. But that's not alleged to have happened here. Okay, but can business practices or course-in-dealing events really just make the wording of the statute null? No. But we would say that the trial court correctly recognized that the interpretation of that statute under Ohio law is to limit the situation to balanced billing circumstances. The trial court noted the Supreme Court explicitly says that 1751.60 has a limited purpose, and therefore we respectfully submit the trial court properly determined that the statute would not apply to anything other than balanced billing. Well, excuse me. Go ahead. What category do you put the $1,066 in that the bill was out, sent out, and ultimately at least part of it was paid? Correct. What is that? That's not a balance? No. They billed her in full. They billed her for the full amount. That was her total bill. Full bill, correct. Had they submitted a claim, received partial payment from the insurance company, and then attempted to bill her for anything other than a deductible or a copay, then that would be balanced billing as defined by the Ohio Department of Insurance. But they sent her a full bill for 100% of the medical services provided. But again, all of this comes under the umbrella of I respectfully submit the appellants haven't asserted a viable claim, none of the eight causes of action in their complaint would be viable, regardless of whether the statute applies or doesn't apply. There still is no viable claim, and under a de novo review, we respectfully submit that the dismissal is still appropriate. And I'll go through these quickly. They've alleged a breach of trust. On my question, I was going to say, does your client do this in all situations where people have gone in for professional services and say, we're not going to fool with this health insurer. We want you to pay 100% on the dollar. If you could do that, that's what you're saying. I think that the way we interpret the Ohio guidance on this issue, that a provider would have the ability to make that business decision if they wanted to. Now, they frequently may choose not to do that. They may prefer to pursue the path of guaranteed payment from an insurance company. In terms of whether my client does or doesn't, I don't have knowledge and I can't submit there's anything in the record that would indicate whether it does or doesn't. And again, this case was decided on the pleading, so we don't yet have any factually developed information. Well, the average person on the street, you say, are you going to the hospital? Yes, but I've got insurance, and that will take care of it. And that's not true in your case at all, right? It's just rolling the dice. No, it's not that she doesn't have insurance. Well, I know, but he may have to pay the whole thing out of his own pocket. Then he'll have to go against United. Of course, because this arose out of a tort situation, she would have the ability to then recover whatever she paid to the hospital. She could then recover that amount from the tort feeser. So she's not ultimately going to be out of pocket. And that does align this case with King and Haber, because those courts recognize that when the provider is seeking payment in a tort circumstance where the money is ultimately paid by the tort feeser, they've held that's not a violation of 17-5-1.60. So the patient here ultimately would not be financially harmed because the tort feeser will ultimately still be responsible for satisfying the medical obligation. The injured person could be the tort feeser. Correct. Auto accident, they could be responsible. They still have medical costs incurred. Correct. That's correct. That's right. So there would be no other pocket in that case. That is correct. And I would submit under those circumstances, a provider may make the business determination to simply seek payment from the health insurance corporation and take the guaranteed payment available. But apart from the tort aspect of it, the relationship of the injured person and the health insurance carrier for her, in the situation where you bill directly, you would expect that that person then would give that bill to her insurance carrier and say do something about it? That's certainly a circumstance that could happen. Certainly. For sure. That's right, Your Honor. Well, if it didn't happen, it would make the insurance kind of a waste of time, wouldn't it? I suppose that's a possible circumstance. And I see him out of time. Well, if there are other questions from the panel, you just stay there and we'll see. Are there other questions? Do you want to finish the line you were pursuing? No, thank you. Okay. Thank you. I'll yield the remaining time to the other appellee. Thank you, Your Honor. Judge Siler, Judge Donald, Judge Guy, good morning. Good morning. I please the Court, David Benjamin Shaver, for controlled credit. We've talked a lot this morning about Ohio revised code section 175160 and its application. I think the language of the statute shows clearly that it does not apply to controlled credit. Controlled credit is neither a provider nor a health care facility under the language that's used in the statute and how those terms are defined in the revised code. I think the Ohio Supreme Court's decision in King v. ProMedica also confirms that the statute does not apply to controlled credit. The Ohio Supreme Court, I think, states pretty clearly in the King opinion that the statute applies to only those entities or persons that might be mentioned within the text, including providers, health care facilities, health insurance corporations. Well, how do you respond to Mr. Ewing's comment that CCC was basically acting as an agent of the health care facility and the knowledge of the health care provider would be attributed to CCC and so they would stand in those shoes? He didn't say exactly that, but he basically said we need to know what they knew and when they knew it and whether they were acting in full knowledge that they couldn't do what they were trying to do. So how do you respond? I don't believe that it's necessarily in the record, but CCC has no such knowledge. Debt collection is a volume business. They receive lots of accounts from lots of different clients. And when that information comes in, they rely on that information and they're entitled to do so. I think it's been the position of this circuit for a long time, since 1992 in the Smith v. TransWorld decision, that a debt collector is entitled to rely on the information that it receives and it is under no duty to conduct an independent investigation of the account prior to attempting to collect it. And that's what happened here. They got information from PRI. They sent an initial letter on, I believe it was May 4, 2015. About a week later, they spoke to Ms. Jackson. She advised that she was represented by counsel and that counsel then negotiated the balance of the bill for less than what she owed and she settled that account. So I'm not sure how Ms. Jackson believes that CCC could have violated these various consumer statutes. She claims to have been misled and deceived when she was represented by counsel. And none of these issues were raised with CCC at any time. In fact, it's my understanding that CCC's first notice of any of these issues was when this suit was filed. Did the provider get around this law just by turning it over to your client from the very start and say, we can't collect it straight from the patient, so we'll turn it over to you and you go get it from the patient and therefore you're not in violation of state law? Well, I think professional radiology's counsel has addressed that issue, but I'm not sure that the answer to that question as to controlled credit matters. You know, they are entitled to rely on the information. They're clearly not subject to the statute themselves. So, you know, I'm not sure what controlled credit is supposed to do in this situation. They receive these accounts. The information is transmitted to it and it relies on that information and goes forth and attempts to collect the account. And it did so in this case. Does it have any duty to investigate as to whether this is one of these medical bills that's covered by the state statute? I don't think so, Judge Siler. I think the Smith v. Transworld decision clearly says that there is no duty to investigate that account prior to attempting to collect it. I think doing so would certainly raise the cost of everything. You know, again, it's a volume business. They receive lots of accounts and they rely on the information that they receive from their clients. And I think I'd like to also echo the point that professional radiology's counsel made, which is the facts in the record support the conclusion of the district court with respect to CCC. Whether this court agrees with the district court's reasoning or not, the conclusion is correct. And judgment on the pleadings as to controlled credit was appropriate. There are no facts in the record to support any of the claims that Ms. Jackson has made against controlled credit. Controlled credit did not breach any contracts, third party, any direct contracts. As I mentioned before, it did not deceive her or mislead her in any way. In fact, again, she was represented by counsel during counsel's communications with controlled credit who negotiated the $1,066 to $852, I believe, of what was ultimately paid. And that was the end of controlled credit's involvement with this whole situation. I don't see any facts that would support claims for fraud or unjust enrichment or conversion. And as we argued to the district court, you know, we've kind of been sitting here thinking, what are we doing in this case? This is an argument about how an account is billed and controlled credit has no involvement whatsoever in billing decisions or determining whether or not an account is appropriately billed to an insured or the insured's insurance company. And I see that my time is up. If there are no more questions from your honors, we respectfully request that the court affirm the district court's judgment as to controlled credit. Thank you very much. Thank you. Mr. Ewing? I'll try to do some of this as much as I can. Just on that last point, by definition, a collection agency, the target of all of their collections are the person for whom the services were rendered. That's what a collection agency does. And so is your theory premised on some sort of collusion or conspiracy between health providers and collection agencies to make an end run around the hospital going directly against the person who got the services? No, your honor, no. Our theory is that while 1751 does not apply to controlled credit because they are not part of the tripartite agreement of health insurer, health insured, and provider, the 1751 does apply to the debt. And it's no different than statute of limitations may not apply to controlled credit, but a statute of limitations does apply to the debt. And this court has held and other courts have held that the pursuit of a time barred debt is a violation of the FDCPA. Well, this wasn't a time barred debt, was it? No, your honor. So that's irrelevant. Well, with due respect, sir, my point is that the time barred debt is not collectible because it is a debt that cannot be legally collected. This cannot be legally collected. Are you saying that a collection agency can never seek payment from somebody who the debt was incurred as a result of treatment in a hospital? Not at all, your honor. In fact, if the patient was uninsured or if PRI was an out-of-network provider and therefore there was no insurance in play and you didn't have the protection of these statutes, then CCC could certainly go after the patient for the money. The reason why they can't in this case is because the law immunized Barbara Jackson from having any responsibility for the bill. Okay, but the statute talks about providers or health care facilities, neither of which applies to CCC. So I'm not sure still how you get, even if we find that the statute covers the situation of the PRI, I don't know how you extend that language of the statute to CCC. I'm just not following you there. I apologize. Maybe I'm not making it clear to the court. The debt never existed. It is not whether 1751 applies to PRI. It's that there was no debt. There was never a debt to be collected under Ohio law. It has nothing to do with CCC. They went to collect a debt that wasn't owed. No different than had it been time barred. No different than it had been a request for interest that was not available under Ohio law. You've got other points you want to cover. I do. The Ohio Department of Insurance Bulletin that was cited by counsel for PRI, wherein it states that it is only a balanced billing statute, the court would look at 2010-06, which rescinded and replaced 2010-03, the Ohio Department of Insurance Bulletin, it states that it does prohibit balanced billing, and then there is a comma, and then there are the words, or seeking compensation from a health insured. So absolutely within the penundra of the total ban, balanced billing is banned. But there is a total ban. As to whether or not there are any case regarding balanced billing, actually King involved balanced billing, because in that case there was a bill to her health insurer, Aetna, and then there was a bill to her MedPay insurer, Safeco. And she claimed that the Safeco was taking money from her, but the court held that that's a third party. You didn't get the bill. It didn't come out of your pocket. What's the best Ohio case that you have to rely upon? Oh, I think, Your Honor, definitely the King v. ProMedica case, I think absolutely stands for the problem. At the 17-minute mark of the oral argument in King, Chief Justice O'Connor states there is no disagreement that this lady does not have to get into her pocket to pay this bill. That can be verified on the publicly. So by implication, you're saying that that case? Absolutely. Absolutely. I think that's it. I think my time's up. I thank the court. Thank you, Mr. Ewing. Let me thank the parties for your argument. The matter is submitted, and the court will issue its opinion in due course. Thank you.